Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

January 15 20 20
WILLIAM M. McCOOL, Clerk
By _____ Deputy

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ROBIN RAY THOMPSON,

Defendant.

NO. CR **CR20 - 5008** RBL

**INDICTMENT**

The Grand Jury charges that:

## COUNT 1
### (Conspiracy to Commit Wire Fraud)

I.   **OFFENSE**

1.      Beginning at a time unknown, but no later than January 13, 2009 and continuing through on or after March 23, 2018, at Vancouver, within the Western District of Washington, and elsewhere, the defendant, ROBIN RAY THOMPSON, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree together to commit offenses against the United States, to wit: to knowingly and willfully devise and execute, and attempt to execute, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of the concealment of

*United States v. Robin Ray Thompson*
Indictment - 1

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

material facts; and in executing and attempting to execute this scheme and artifice, to knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain signs, signals and sounds as further described below, in violation of Title 18, United States Code, Section 1343.

## II.    OBJECTIVES OF THE WIRE FRAUD CONSPIRACY

2.    The objectives of the conspiracy included the unjust enrichment of THOMPSON and his co-conspirators through multiple financial fraud schemes conducted by means of the internet that had the common goal of tricking and deceiving both legitimate businesses/victims and other individuals conducting fraud on such businesses/victims, into causing funds to be transferred into accounts under the conspiracy's control.  These fraud schemes included, among others, business email compromise schemes, inheritance scams, advance fee scams, operating a sham financial institution, and operating a sham investment company.

## III.   MANNER AND MEANS OF THE CONSPIRACY

3.    The manner and means used to accomplish the conspiracy included, among others, the following:

## A.     Operation of Sham Businesses

4.    THOMPSON, with assistance from his co-conspirators, set up and maintained two sham businesses to facilitate the execution of various fraud schemes.

### 1.     Pacific West Equity & Finance

5.    Starting at a time unknown, THOMPSON operated a fraudulent business operating under the name of Pacific West Equity & Finance ("Pacific West"), which purported to be an investment firm.  THOMPSON held himself out as the vice president and chief of acquisitions of Pacific West.

6.    On or about January 13, 2009, THOMPSON extended a written loan offer to an individual (Victim-1) located in Costa Rica.  According to the offer, Pacific West

*United States v. Robin Ray Thompson*
Indictment - 2

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   would loan Victim-1 a net amount of $26,000,000.  However, the loan was contingent on

2   Victim-1 making a "due diligence deposit" in the amount of $35,000.  To induce Victim-

3   1 to make the deposit, THOMPSON created a fraudulent letter that purported to be an

4   official letter from "Barons Investment & Trust Services" confirming that Pacific West

5   had a current brokerage balance of $1.8 billion dollars.  In truth in fact, Pacific West had

6   no significant assets and had no capability of extending a loan, much less a loan for

7   $26,000,000.

8        7.      Based on THOMPSON's fraudulent misrepresentations, Victim-1 signed

9   the loan contract and wired the $35,000 deposit.  When THOMPSON and Pacific West

10  failed to deliver the loan, Victim-1 requested a refund of his deposit.  THOMPSON

11  refused to return the deposit and claimed that Pacific West was entitled to keep the funds

12  because the victim had misled the company and had failed to provide requested

13  documents.  In an email sent on or about March 11, 2009, THOMPSON explained:

14        Now you wish to play the victim, that is simply not going to happen.  As I
          have stated in the past, if you had put this much effort into the project, we
15        would have been funded by now.  However you chose to go your own way
          and now you wish to blame someone else for your mistakes.  Again that is
16        not going to happen.  Please feel free to contact anyone you wish and
          please seek the court[']s remedy.  However I would ask that you do not
17        bother me again with this or I will have no choice but to reopen your
18        account and bill additional hours for time wasted on your account on your
          behalf.
19

20

21        8.      On or about March 16, 2009, Vicitm-1 filed a complaint with the Better

22  Business Bureau.  Subsequently, on or about March 19, 2009, Victim-1 filed an online

23  complaint on the website, Ripoff Report, alleging that THOMPSON and Pacific West

24  fraudulently induced him to make the $35,000 transfer.

25        **2.      Pacific Investors Management Group LLC**

26        9.      Victim-1's online complaint negatively impacted the conspiracy's ability to

27  operate under the auspices of Pacific West.  As a result, THOMPSON and his co-

28  conspirators opened a new business called Pacific Investors Management Group, LLC

*United States v. Robin Ray Thompson*
Indictment - 3

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  (PIMG).  On or about January 21, 2011, THOMPSON's girlfriend (CC-1) signed an

2  application to register PIMG to do business in California.  The application indicated that

3  PIMG was a Delaware corporation that was formed on October 20, 2009.

4        10.    In an email sent on or about August 26, 2014, THOMPSON described

5  PIMG to a potential customer as follows:

> We are a boutique private investment firm managing companies that raise
> money for select real estate, hotel, casino, business, technology, energy,
> marine, and entertainment projects, worldwide, exclusively through direct
> private placement with our investors.  The fund raising process is straight-
> forward, transparent, very low cost, and essentially risk-free.  We presently
> have over a billion dollars of registered investor capacity.

In truth and fact, PIMG had no legitimate investors and no actual "investor capacity."

      11.    THOMPSON attempted to create the illusion that PIMG was a legitimate

financial institution that provided a wide variety of banking and investing services.  For

example, in a marketing email sent to numerous individuals, THOMPSON wrote that

PIMG customers "can benefit from highly personalized banking products featuring our

best relationship rates.  As a Pacific Investors Management Group, LLC customer, you

will also have access to exclusive debit cards and checks and receive expedited

processing on loans, mortgages and credit card requests."  THOMPSON went on to

explain that, "[f]or more than 100 years, we've helped our clients preserve and grow

wealth.  As your trusted partner we will leverage our global resources to deliver local,

sophisticated wealth management solutions to help you achieve your future dreams."

THOMPSON also advertised that PIMG could provide investment management services,

estate planning, personal trusts, and charitable planning.  In truth and fact, PIMG was a

sham company, had no significant assets, and had no ability to provide legitimate

banking and investing services.

      12.    THOMPSON and his co-conspirators sought to transact with individuals

who were, themselves, involved in suspect businesses and fraud schemes.  THOMPSON

repeatedly let his prospective partners know that PIMG was in the business of receiving

*United States v. Robin Ray Thompson*
Indictment - 4

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

funds that could not be handled by traditional means.  In his marketing emails, THOMPSON wrote, "[w]e can take un bankable [sic] funds and make them bankable. We can convert unreported income and all high end valuables into cash."

**B.      Use of Bank Accounts to Facilitate the Conspiracy**

13.      THOMPSON and his co-conspirators set up and used a variety of accounts to receive the funds that the conspiracy solicited.  Due to a concern that the Internal Revenue Service (IRS) would garnish or seize funds transferred to accounts under his name, THOMPSON generally directed funds to accounts that were set up by two co-conspirators -- CC-2 and CC-3.

14.      CC-2 is a long-time associate of THOMPSON who lived in Canada. CC-2 set up and maintained numerous accounts in Canada to facilitate the conspiracy.  At various times, CC-2 held himself out as a trustee, financier, and attorney for PIMG.

15.      CC-3 is the father of CC-1.  CC-3 set up and maintained at least one account in the United States to facilitate the conspiracy.  CC-3 held himself out as a trustee of PIMG.

16.      THOMPSON's general preference was to use CC-2's accounts in Canada for larger transactions.  For example, in an email sent on or about August 25, 2014, THOMPSON provided a prospective client with the wiring information for one of CC-2's accounts in Canada, but explained that "if there are smaller increments that are needed to be sent, I have 3 accounts set up in the states for amounts under $50,000".

17.      THOMPSON represented that PIMG had the ability to receive and transfer large sums of money.  For example,  in an email sent on or about December 27, 2014 to an individual who purported to be a banker in Malaysia who needed help with a deal involving $52 million, THOMPSON represented that he was "very interested" in assisting with the transfer.  THOMPSON explained, "[k]eep in mind that I am in the financial services industry annd[sic] do actually have the ability to transfer such a sum."

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

C.      **Solicitation of Funds**

18.     After the creation of PIMG, THOMPSON generally solicited funds by responding to numerous spam emails that promised the recipient a financial windfall in return for participating in some sort of financial transaction. The senders of these emails presented outlandish stories of having massive sums of money that could be released with the recipient's assistance.

19.     For example, on or about May 8, 2018, THOMPSON received an email from an individual purporting to be the widow of the former prime minister of Libya, Muammar al-Gaddafi. The individual explained that she had escaped to Nigeria and was "desperately looking for a foreign reliable partner" who could assist with accessing a fund worth $40.5 million that was waiting to be claimed and invested. The following day, THOMPSON responded, "Madam, . . . I believe that we have been contacted by you once before. Please do advise as to how we may be able to help you." In fact, this was not the first time that the conspiracy had corresponded with individuals purporting to have access to the al-Gaddafi family fortune. For example, THOMPSON and CC-2 made efforts in 2015 to do business with an individual who purported to have possession of a $100 million fund that was related to a "unique private partnership" with the son of the late Muammar al-Gaddafi, who was awaiting trial for war crimes.

20.     THOMPSON understood that the parties from whom he was soliciting funds likely were fraudsters themselves, looking to trick THOMPSON into paying an advance fee or deposit before he could receive access to the promised funds. Among the reasons THOMPSON was wary of this technique was that he had used a similar technique when he defrauded Victim-1 of his $35,000 "deposit." Accordingly, when soliciting funds, THOMPSON regularly emphasized that PIMG would only pay a deposit or fee once it had received a transfer of the promised funds.

21.     On or about March 23, 2015, THOMPSON sent CC-2 an email explaining his attitude toward prospective partners who demanded an advance fee or deposit:

Just sitting at the computer so thought I would reply this way I know that
you cannot actually be waiting for these idiots. They take forever under the
best of circumstances and these are the absolute worst. Just got off the
phone with the fuck head who was sending last week and he is of course
having issues. He wants 100k for a 12.5k loan. I told him go a head [sic]
even though I know it [sic] just a way into my pockets. I really do not care
until I get it under my control, so I always just agree to everything then we
can renegotiate after I receive and see how things go. . .

22.   THOMPSON cast his net wide and far when soliciting funds. For example,
in approximately August 2014, THOMPSON attempted to do business with an individual
who claimed to have won the lottery and who now wanted to make an $800,000 donation
because he believed that THOMPSON was "chosen by God to Receive my Donation."
However, THOMPSON quickly became frustrated with his purported benefactor's delay
in making the "donation." In an email sent on or about September 2, 2014, THOMPSON
wrote:

We are now starting a new month and as yet [you] have not transferred a
single dollars [sic] to the accounts I have provided. This is our business as
I informed you earlier. It seems that we are not moving forward as I keep
informing you that we will not pay **ANY ADVANCE FEES FOR ANY
REASON WHAT SO EVER** until successful completion of the transfer . .
. we will pay all bills upon successful completion of the transfer, or if this is
not possible for any reason what so ever we will treat this as a scam and we
will no longer participate as it quite simply wastes our time and
resources . . .

(Emphasis in the original.)

23.   THOMPSON often focused his efforts on pursuing opportunities with
individuals who claimed to be able to give THOMPSON access to millions of dollars if
THOMPSON were to pose as the next of kin of a deceased individual. For example,
THOMPSON indicated that PIMG wished to do business with individuals who sent the
following inheritance scam emails:

a.   An August 23, 2014 email from an individual purporting to be the
chief executive auditor of a major U.S. financial institution and who claimed to have

*United States v. Robin Ray Thompson*
Indictment - 7

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

$15,850,000 of funds that he could release to THOMPSON provided that THOMPSON claimed to be the next of kin of a deceased customer.

        b.    A December 15, 2014 email from an individual who indicated that the Management of Industrial and Commercial Bank of China was considering whether to release of $68,200,000 of inheritance funds to THOMPSON.

        c.    A December 16, 2014 email from an individual who purported to be a personal account manager of a major financial institution in Malaysia and who had the ability to transfer $52,000,000 million to THOMPSON provided that THOMPSON posed as the next of kin of a deceased oil contractor.

    24.    THOMPSON understood that it would be fraudulent for him to claim that he was entitled to claim the inheritances based on his purported relationship with unknown and unrelated strangers.  Undeterred, THOMPSON took steps to encourage the transfer of purported inheritance money to accounts under the conspiracy's control.  For example, on or about September 12, 2014, THOMPSON completed an application purportedly to the Bank of Benin Republic for the release of $10,800,000 to a trust account set up under CC-2's name.  In the application, THOMPSON stated, "[kl]indly be informed that I am ready for the claiming, release and transfer of the unpaid contract sum of (US $10,800,000.00) deposited . . .with your bank belonging to my deceased relative, having been informed of his painful death by the deceased personal attorney Barrister John Paul."

    25.    At times, the conspiracy's efforts to obtain money involved the approval and submission of elaborate, fraudulent documents.  For example, on or about March 18, 2015, THOMPSON sent an email to an individual posing as the executive governor of the Central Bank of Nigeria, attaching documents in support of an application for the release of $45.5 million that purportedly had been awarded to THOMPSON for an oil pipeline expansion project in Nigeria.  The documents included the following "Beneficiary's Declaration" signed by THOMPSON which requested the transfer of the funds to CC-2's account in Canada:

*United States v. Robin Ray Thompson*
Indictment - 8

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

19
20
21
22
23   //
24
25
26   //
27   //
28

*United States v. Robin Ray Thompson*
Indictment - 9

1  The documents also included the following "Money Laundering Clearance Certificate":



On both forms, THOMPSON listed the address of the hotel at which he and CC-1 were living at the time.

**D.      Theft of Funds from Victim-2**

26.      In or about January 2015, the conspiracy received funds that had been stolen through a business email compromise (BEC) scheme. A BEC scam generally involves deceiving businesses to induce them to initiate large wire transfers from the businesses' accounts to those controlled by the criminal organization. BEC schemes are carried out primarily in two ways. First, the perpetrators of the scheme may compromise legitimate business e-mail accounts that belong to the CEO, CFO or other high level employees of the business through social engineering or computer intrusion techniques. Second, the perpetrators may spoof the e-mail account of a high-level employee at the victim company, so that it appears very similar to a legitimate account and would take

*United States v. Robin Ray Thompson*
Indictment - 10

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   very close scrutiny to determine it was fraudulent.  The perpetrators of the scheme then

2   use the compromised or spoofed e-mail account to impersonate the high-level employee

3   and issue instructions to other employees directing them to initiate wire transfers to bank

4   accounts controlled by the criminal organization.

5        27.    Victim-2 is a company headquartered in Vancouver, Washington with over

6   a thousand retail locations across the United States.  On or about January 27, 2015,

7   Victim-2's controller -- working from Vancouver, Washington -- received an email from

8   an individual masquerading as Victim-2's chief financial officer.  The email instructed

9   the controller to wire over $241,000 to CC-3's bank account.  The email included what

10  appeared to be a forwarded message from Victim-2's chief executive officer requesting

11  the transfer.  The email contained personal information regarding Victim-2's chief

12  executive officer and chief financial officer.  However, the actual account that the

13  fraudster used to communicate with Victim-2's controller was from a domain name that

14  was identical to Victim-2's legitimate domain, but for the inclusion of an extra letter.

15  The alteration to the domain name was so slight, and the content of the email itself was so

16  convincing, that the controller did not realize the email address was fraudulent.

17  Subsequently, the controller arranged for the wire transfer as requested in the email.  On

18  or about January 27, 2015, $241,657.29 was sent from Victim-2's bank account at Wells

19  Fargo Bank in Vancouver, Washington, to CC-3's account at Citibank located in

20  Oakland, California.

21       28.    Although THOMPSON did not send the BEC email to Victim-2, he and his

22  co-conspirators were intimately involved in arranging for the receipt of the funds.

23  Beginning sometime in 2014, THOMPSON communicated with individuals using the

24  names "Dave Wember," "Ben Tony," and "Ismila," who claimed to be in a position to

25  provide THOMPSON access to over $30 million in connection with a transaction with

26  the government of Nigeria.

27       29.    On or about December 16, 2014, THOMPSON sent Dave Wember an

28  email containing the wire information for CC-2's account, and noted "[h]ere is the new

*United States v. Robin Ray Thompson*
Indictment - 11

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

account info.  Please advise prior to sending the exact amount, how much needs to be sent back and where it is to go.  I sure hope we can get this done quickly and I really do appreciate you working so diligently."

30.  On or about January 28, 2015, THOMPSON received an email from Dave Wember attaching a wire confirmation slip showing that $241,000 had been transferred from Victim-2's account in Vancouver, Washington to CC-3's account in California.

31.  On or about January 28, 2015, Ben Tony sent THOMPSON an email directing him to wire $215,000 of the funds to an account in Hong Kong.  Ben Tony further indicated that once the funds had been wired, THOMPSON would receive a subsequent transfer of $450,000.

32.  In response, on or about January 28, 2015, THOMPSON sent an email to Ben Tony and Dave Wember indicating that his trustee was having trouble with the wire and had made an attempt to contact the sender of the wire.  THOMPSON explained that CC-3 was "a lawyer and acts on behalf of our firm so what I want really does not matter to him."

33.  On or about or about January 29, 2015, Dave Wember responded that he was "perplexed" by THOMPSON's email and viewed THOMPSON's attempt to vet the source of the funds as "most unrealistic and unprofessional."

34.  That same day, Ben Tony joined in Wember's protest and expressed surprise at THOMPSON's questions about the funds that his "trustee had received." Tony explained:

> You know how long it took me to get a willing investor, considering there i[s] no collateral to my loan request.  Now the financial involvement of my USA associate is strictly confidential and it is a total breach of trust that I should allow that you or any other parties involved should establish contact with them in any way whatsoever on related issues.  I will therefore very seriously warn and advise that you do no such thing and instruct the Trustee likewise. . . . I will expect that you honor our trust and proceed as instructed to make remittance of funds. . .

*United States v. Robin Ray Thompson*
Indictment - 12

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.     On or about January 30, 2015, THOMPSON sent Ben Tony an email assuring his purported partners that he was working hard to complete the transaction: "As I had stated early on, I will do everything in my power to see that this is completed successfully.  I am up working on it early as I am out of the office again today . . . Very little sleep but duty calls . . . I will take time out to insure you are kept apprised of the situation."

36.     On or about January 31, 2015, THOMPSON sent Ismila an email complaining about Ismila's persistence in inquiring about the status of the funds.  In the email, THOMPSON threatened to have CC-3 return the funds to Victim-2:

> I was just advised by my front desk attendant that you had called and was very rude. I do not appreciate this nor will I tolerate it. I have advised you in the past that we at all times must maintain a professional and courteous relationship in all of our dealings. I have a job to do here not only on your behalf but on behalf of all of my clients and I will cease our dealings at once if this ever happens again. I have advised everyone that I will attempt to obtain a direct and private number tomorrow and advise all of the new number. If this is in someway not acceptable to you then we can cease everything at this juncture with no hard feelings I will have the trustee return the wire to its originator, which he wants to do anyway, and we will cease all communications. I am here on property at the owners request and these people do not work for me, so please always maintain the proper respect. I will always take your calls when I am available.

37.     In response, Ismila sent an email explaining that he had not intended to be rude on the phone and apologized if his call had been misconstrued.  Ismila explained: "First and foremost, I will like to inform you that I did not pass any insult or rude to anyone. . . I am a man of integrity and I will keep that integrity till I depart from this planet earth."  Ismila requested that THOMPSON obtain a direct mobile line so he did not need to contact THOMPSON through a third party.  Ismila further requested that THOMPSON direct CC-3 to transfer the funds.

38.     On or about January 31, 2015, THOMPSON accepted the apology and expressed his own commitment to personal integrity:

*United States v. Robin Ray Thompson*
Indictment - 13

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sir,

I appreciate your response and will never speak of it again as I too believe in integrity and earnest [sic] in all of my dealings. I will endeavor to obtain a new private and direct number today and will forward the number as soon as I receive it.

Again I look forward to a long and truly wonderful relationship with all for the future.

Sincerely,

Robin R Thompson, V.P. Operations
Pacific Investors Management Group, LLC.

39.    The reconciliation between THOMPSON and his partners was short-lived. On or about February 2, 2015, Dave Wember sent THOMPSON an email demanding that CC-3 transfer the funds. Wember wrote, "[a]lready, we have wasted undue time moving on with pending transaction [sic], it is needless we delay further." In response, THOMPSON wrote that CC-3 -- acting as the trustee for PIMG -- "does not really care what any of us want and until he decides to release the funds we are at his mercy." THOMPSON explained that his partners should have sent the money to his trustee in Canada (CC-2) "because [CC-2] works for me and will do what I say immediately." In truth and fact, CC-3 -- like CC-2 -- was fully operating under THOMPSON's direction and control.

40.    Knowing that the funds in question had been obtained by fraud from Victim-2, and knowing his purported partners would not want the money to be sent to back to Victim-2, THOMPSON proposed the following:

Lets start working to get this done ASAP. The last conversation I had with the trustee was that there was something not right with the transfer, illegal, fraud, something and he was going to do nothing until he got to the bottom of it. I suggest that we return the wire to the originator and have him send it to the TD Canada Trust account and it can be in your hands in less than 36 hours.

*United States v. Robin Ray Thompson*
Indictment - 14

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.     THOMPSON's email prompted an immediate response from Ben Tony, who expressed his displeasure with THOMPSON's refusal to transfer the funds: "I am shocked to my bones, because this was not what we all agreed to and not what you assured me personally, now it sounds that you are deviating from the original plans, is there anything you are not telling me or us??" In truth and fact, THOMPSON was concealing information from his purported partners. As alleged in Count 4, THOMPSON already had directed CC-2 and CC-3 to disperse the funds, so that THOMPSON and his co-conspirators could use the proceeds.

42.     Despite having already spent a large portion of the funds, THOMPSON persisted in claiming that CC-3 insisted on returning the funds to Victim-2.

43.     This prompted the following pointed response from Dave Wember:

> Should you fail to give clear details of above transaction in all ramification, then I assure you I shall employ all necessary measures to deal squarely with this issue. I will forward my entire correspondences with you to the IRS the CIA and the FBI for a thorough investigation. And off [sic] course, I will provide them with the bank coordinates of the Trustee. Although my esteemed friend, the financier, did initially request for absolute confidentiality and discretion in his involvement in our primary concern I am certain he will understand, accept, encourage, and facilitate my line of action. What you and the Trustee have done here, is completely criminal, a breach of trust and it will not go unaddressed, "TRUST ME", except of course you proceed immediately to disburse funds as instructed.

44.     Shortly thereafter, Wember sent an additional email indicating that he had discovered the online fraud report about THOMPSON and Pacific West that had been filed by Victim-1. Wember wrote, "I am sure you know you are very traceable . . . Well, if I do not get positive response from you within the hour, I will involve the FBI, the CIA and the IRS . . . Lets see how far you can run and how well you can hide."

45.     On or about February 3, 2015, THOMPSON wrote, "I cannot make the trustee do anything he does not want to do much like I could not make you guys do what was needed many months ago. We just need to be patient . . . . That being said the trustee is returning the wire this morning and he is done with it, period." Despite the animosity

*United States v. Robin Ray Thompson*
Indictment - 15

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

from his purported partners, and despite the fact that THOMPSON had already spent a large portion of Victim-2's money, THOMPSON continued to toy with Wember, Tony, and Ismila by offering to compensate them by sending them a portion of a large dividend he claimed he had received from his company. Although THOMPSON's offer of funds temporally satisfied his partners, they resumed their questioning when THOMPSON failed to deliver the promised funds. In response to their repeated inquires on the status of the transfer, on or about February 3, 2015, THOMPSON sent an email explaining, "[w]e were advised late yesterday that there was a problem with the transfer and all in coming and out going wires have been stopped until we meet this morning with bank security. I will keep you advised."

46.     On or about February 4, 2015, THOMPSON sent an email responding to written questions that had been raised by Wember. In response to a question from Wember about why THOMPSON did not have more precise contact information and to Wember's citation of the online fraud report from Victim-1, THOMPSON wrote:

> I AM CHIEF OF ACQUISITIONS. I AM ON SITE AT A PROPERTY THAT IS BEING OBTAINED BY OUR CLIENT. I INSURE [sic] THAT ALL IS WHAT IT IS SUPPOSED TO BE. OUR FIRM HAS NO LEGAL COMPLICATIONS OR OTHERWISE. WE HAD ONE DISCONTENTED CLIENT WHO MADE FALSE AND BASELESS ALLEGATIONS ON A SHAM WEB SITE. . . WE SIMPLY DO NOT CARE ABOUT THAT BASELESS AND SHAM WEBSITE AS WE WASTED MANY MONTHS AND MUCH MONEY JUST TO BE TOLD THAT THE ONE PERSON WHO WAS DOING THE COMPLAINING WAS OUT OF THE COUNTRY . . .

In response to Wember's threats to bring the matter to law enforcement, THOMPSON responded:

> NEVER THREATEN US AS WE DO ABSOLUTELY NOTHING ILLEGAL DUE TO ALL OF THE LICENSES WE ARE REQUIRED TO MAINTAIN AND OUR POSITION IS ALWAYS [TO] FIGHT BACK BECAUSE WE ARE TRUE TO WHAT WE SAY AT ALL TIMES. SO THREATS ARE JUST AN ANGRY WASTE OF TIME FOR US. THERE IS NOTHING ILLEGAL HERE AND ABSOLUTELY NO BREACH OF

*United States v. Robin Ray Thompson*
Indictment - 16

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  TRUST AS WE ARE FOLLOWING BANKING PROTOCOLS
2  INITIATED BY OUR GOVERNMENT.

3  In truth and fact, THOMPSON and his co-conspirators had no licenses to operate a

4  money-transmitting business, a financial institution, or an investment firm, and

5  little regard for "banking protocols."

6       47.    Subsequently, on or about February 6, 2015, THOMPSON reported that

7  Victim-2's funds had been returned to Victim-2's account.  In response, Dave Wember

8  sent an email on or about February 9, 2015, demanding to see documents that proved that

9  the funds had been returned to Victim-2.  Wember wrote, "[i]t is absolutely unrealistic

10  that you claim funds are sent back and yet you will not provide us with evidence of a

11  transfer slip to the returned funds to his company's account."

12       48.    On or about February 9, 2015, THOMPSON responded:

13  Gentlemen,

14  
15  This will most probably be our last and final communication.  You have
   called me a liar a thief etc and etc and the only one who was wronged here
16  was me.  I owe you nothing and so for you to demand anything from me is
   a total waste of your time.  You either stole these funds from [Victim-2] or
17  had someone there do it and either way it is fraud and they have froze [sic]
   all accounts and retrieved the funds.
18  

19       49.    THOMPSON's purported partners made additional attempts to encourage

20  THOMPSON to transfer the funds, including an email from Ismila sent on or about

21  February 11, 2015, in which Ismila pleaded with THOMPSON to make the payment so

22  that the rest of the planned transaction could be completed.  In response, THOMPSON

23  adamantly insisted that he had acted honestly:

24  The funds have been returned to the originator, [Victim-2] and Wells Fargo
   by Citibank security . . . No one is trying to do anything foolish here.  I
25  have been honest and straightforward with you in all of my dealings,
   however I did not get the same courtesy and respect from your end as I
26  have been threatened, called a liar and a thief and everything that I have
27  said to you was exactly as it has happened.  The funds have been returned,

28

period.  Victim-2 has stated that they were in fact stolen funds, fraudulent obtained and the bank has returned them, period.

THOMPSON then went on to explain that, had Ismila simply notified THOMPSON from the outset that the funds were stolen, he could have made different arrangements to receive the funds:

> As I have stated earlier, had your guy just followed instructions and sent the funds to my guy [CC-2] in Canada, we would not be going through this as we are insured there, just not here [in the United States]. ***And had you been honest with me that the funds were in fact coming to me hot***, I would have done things much much differently, however that ship has sailed and here we are.

(Emphasis added).

50.     Despite the breakdown in the relationship, on or about September 2, 2015, THOMPSON sent Ben Tony a generic email soliciting business.  As with his prior marketing emails, THOMPSON indicated that PIMG could "take un bankable [sic] funds and make them bankable."  In response, Ben Tony wrote, "STOP WRITING ROB, YOU ARE A CRIMINAL.  WHAT HAPPENED TO THE FUNDS OVER 247,000 DOLLARS WIRED TO THE ACCOUNT YOU PROVIDED? . . . ARE YOU TRYING TO SEE IF I CAN FALL PREY TO YOUR CRIMINAL INSTINCTS AGAIN?"

**E.     Continuation of Conspiracy**

51.     After the successful receipt of the funds stolen from Victim-2, the conspiracy continued to pursue additional transactions.  For example, on or about February 2015, THOMPSON and CC-2 communicated with an individual or individuals using the name "Nisei Seino."  Seino indicated that he had access to a fund worth $90 million that he wished to transfer to THOMPSON and CC-2.  On or about February 24, 2015, Seino explained in an email to CC-2 that the money would be divided as follows: "For your role in this transaction you will be allocated with 25% between you and Thompson then 55% will be used for real estate investment under your supervision then the remaining 20% will be for me and my associates."  To encourage Nisei to transfer the

*United States v. Robin Ray Thompson*
Indictment - 18

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

funds, CC-2 portrayed himself as a lawyer and a financier for PIMG who could assist with such a large transaction.

All in violation of Title 18, United States Code, Section 1349.

**COUNT 2**
**(Wire Fraud)**

52.    The allegations set forth in Paragraphs 1 through 51 of this Indictment are re-alleged and incorporated as if fully set forth herein.

**I.    OFFENSE**

53.    Beginning at a time unknown, but no later than January 13, 2009, and continuing through on or after March 23, 2018, at Vancouver, within the Western District of Washington, and elsewhere, ROBIN RAY THOMPSON, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and by means of the concealment of material facts.

**II.    OBJECTIVE OF THE WIRE SCHEME**

54.    The objective of the scheme and artifice to defraud was to trick Victim-2. and individuals purporting to be Dave Wember, Ben Tony, and Ismila, into causing funds to be transferred into accounts under THOMPSON's direction and control.

**III.    MANNER AND MEANS OF THE SCHEME**

55.    The manner and means of the scheme and artifice to defraud are set forth in Paragraphs 3 to 51.

*United States v. Robin Ray Thompson*
Indictment - 19

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV.    EXECUTION OF THE SCHEME

56.    On or about the date listed below, at Vancouver, within the Western District of Washington, and elsewhere, ROBIN RAY THOMPSON, and others known and unknown to the Grand Jury, for the purpose of executing the aforementioned scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, promises and concealment of material facts, and attempting to do so, did knowingly and intentionally cause to be transmitted, in interstate commerce by means of a wire communication, certain signs, signals, and sounds, as described below:

| Date | Wire |
|------|------|
| January 27, 2015 | Interstate electronic communication from Vancouver, WA, initiating wire transfer of $241,657.29 from Wells Fargo bank account *4442 to Citibank account *2768. |

All in violation of Title 18, United States Code, Section 1343.

## COUNT 3
### (Operation of an Unlicensed Money Transmitting Business)

57.    The allegations set forth in Paragraphs 1 through 56 of this Indictment are re-alleged and incorporated as if fully set forth herein.

58.    Beginning at a time unknown, but no later than January 13, 2009, and continuing through on or after March 23, 2018, at Vancouver, within the Western District of Washington, and elsewhere, ROBIN RAY THOMPSON unlawfully, willfully, and knowingly conducted, controlled, managed, supervised, directed, and owned all and part of an unlicensed money transmitting business affecting interstate and foreign commerce. Operating under the auspices of PIMG, THOMPSON, (a) without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor and a

*United States v. Robin Ray Thompson*
Indictment - 20

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

felony under State law, and (b) while failing to comply with the money transmitting business registration requirements under Section 5330 of Title 31, United States Code, and regulations prescribed under such section, caused the transmission of funds by means of wire and checks from Washington and elsewhere.

All in violation of Title 18, United State Code, Sections 1960 and 2.


## COUNT 4
### (Conspiracy to Commit Money Laundering)

59.     The allegations set forth in Paragraphs 1 through 58 of this Indictment are re-alleged and incorporated as if fully set forth herein.

## I.     THE CONSPIRACY

60.     Beginning at a time unknown, but no later than January 13, 2009, and continuing through on or after March 23, 2018, at Vancouver, within the Western District of Washington, and elsewhere, ROBIN RAY THOMPSON, and others known and unknown to the grand jury, did knowingly combine, conspire, and agree, with each other, and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit:

a.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and operation of an illegal money transmitting business in violation of Title 18, United States Code, Section 1960, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knowing

*United States v. Robin Ray Thompson*
Indictment - 21

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

        b.    to transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and operation of an illegal money transmitting business in violation of Title 18, United States Code, Section 1960, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

        c.    to knowingly engage and attempt to engage, in monetary transactions by, through and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, and operation of an illegal money transmitting business in violation of Title 18, United States Code, Section 1960, in violation of Title 18, United States Code, Section 1957.

## II.   MANNER AND MEANS OF THE MONEY LAUNDERING CONSPIRACY

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

*United States v. Robin Ray Thompson*
Indictment - 22

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

61.     THOMPSON and his co-conspirators set up and maintained a variety of bank accounts to receive the proceeds of the specified unlawful activity.

62.     THOMPSON rarely used his own accounts to receive proceeds because he believed that the IRS was monitoring his accounts and could seize any funds that he deposited.   In multiple emails, THOMPSON complained about the IRS' intrusion into his affairs.  In an email to CC-2 sent on or about July 2, 2015, THOMPSON stated, "[n]ow you know how I have felt for the past 3 years and I have the friggin IRS up my ass."  Similarly, in an email to CC-2 sent on or about February 16, 2016, THOMPSON wrote, "[I] [h]ave to drive to Irvine today to have a face to face with the banker, and I am guessing a surprise visit by the friggin IRS bitch."

63.     In approximately September 2015, THOMPSON worked to arrange the receipt of $500,000.  On or about September 17, 2015, THOMPSON sent an email instructing CC-2 to wire a total of $417,000 of the anticipated money to four different bank accounts. THOMPSON explained, "[h]ere are the accounts that need to be paid and the amounts.  That will be $50,000 for you and leave $34,000 up there to pay any additional bills that may come due.  We should get a pretty steady stream after this, so keep your fingers crossed."

64.     On or about December 17, 2015, THOMPSON instructed CC-2 to wire $6,000 to an individual in Oregon and $2,500 to an individual in South Carolina.

65.     THOMPSON orchestrated the laundering and disbursement of the funds that were stolen from Victim-2.  Indeed, during the same period in which he was threatening Dave Weber, Ben Tony, and Ismila with returning the funds to Victim-2, THOMPSON was busy giving his co-conspirators instructions on how to launder and dispense the funds.

66.     THOMPSON directed CC-3 to wire $100,000 of Victim-2's money to the bank account of a clerk at the hotel at which he and CC-1 were living.  THOMPSON then directed the clerk to use the funds to pay for, among other things, an $18,433.38 hotel

*United States v. Robin Ray Thompson*
Indictment - 23

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   bill, an $18,353.12 automobile finance debt, and over $3000 in storage bills.

2   THOMPSON also directed the Clerk to dispense at least $15,000 to CC-1.

3        **67.**    THOMPSON also directed CC-3 to wire $100,000 of Victim-2's money to

4   CC-2's account in Canada.  On or about January 29, 2015, THOMPSON sent CC-2 an

5   email with the following instructions:

6        Should definitely have something there today.  I will move $100k into the

7        US dollars account [in Canada].  You take $10,000.00[,] move it to your
         account.  Pull $6000 cash and wire to [CC-1] through western union.

8        $3000.00 at a time.  3000[,] next day 3000 more (in case your [sic] a

9        dummie).

10       **68.**    On or about January 30, 2015, THOMPSON gave CC-2 instructions on

11  how to launder the remaining proceeds.  THOMPSON instructed CC-2 to transfer

12  $11,500 to an account of an individual in Sherwood, Oregon, and $25,000 to an account

13  of an individual in Weaverville, North Carolina.  On the same day, CC-2 sent

14  confirmation that he had made the transfers as instructed.

15       **69.**    On or about February 1, 2015, THOMPSON sent an email to the individual

16  in Oregon, explaining:  "Attached is the wire transfer receipt from . . . [CC-2] from

17  Canada to you.  He is from Calgary in case they ask, which they have been, this is a loan

18  repayment.  I just wanted to thank you so much for the loan, the help and the

19  understanding, and the patience that you have shown to both [CC-1] and myself."

20  Similarly, on or about February 1, 2015, THOMPSON sent an email to the individual in

21  North Carolina attaching a wire transfer receipt and providing the same instructions.

22  THOMPSON wrote, "I wanted to thank you so very much for all of your help and

23  support, love and understanding.  You really helped us out more than you will ever

24  know."

25       **70.**    THOMPSON and CC-2 took steps to avoid suspicion when they laundered

26  proceeds.  For example, on or about January 30, 2015, THOMPSON sent an email to CC-

27  2, indicating that they may not be able to wire money to CC-1 because Western Union

28  was asking "too many questions."  CC-2, responded the same day, "I definitely think

*United States v. Robin Ray Thompson*
Indictment - 24

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

another receiver is the way to go.  Two days in a row is gonna be too hot."  On or about January 31, 2015, THOMPSON emailed CC-2 with information for a new account to use instead of CC-1's account, and information that CC-2 should use to explain his relationship with the owner of the new account: "Here is the new info.  He has been a good friend to you for years (8).  In case they ask. NO H in [his name.] Be sure." Subsequently, CC-2 sent THOMPSON the following message:

> OK big guy, . . . Heading to [Western Union] about [CC-1] . . . they wanted to know everything.  Last time I saw her.  Relationship.  What the money was _for_ . . . is there a mole on her but[t] . . . cheek.  etc.  Had to act on the fly.  Pulled it off but what about cris?  Any advice?  Or should I ab lib?"

(Emphasis in the original.)

71.     On or about February 2, 2015, CC-2 send an email to THOMPSON thanking him for his share of the proceeds.  CC-2 wrote: "Just a note to say sincerely thank you.  You paid me well [to] do very little.  I hope the next transaction comes larger[.] And quicker."

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

72.     The allegations set forth in Paragraphs 1 through 71 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture.

### Counts 1 and 2

73.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of any of the offenses charged in Counts 1 and 2 of this Indictment, the defendant, ROBIN RAY THOMPSON, shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to that offense, including but not limited to a sum of money representing the property described in this paragraph.

UNITED STATES ATTORNEY
700 STEWART STREET
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**Counts 3 and 4**

2    74.    Pursuant to Title 18, United States Code, Section 982(a)(1), upon

3  conviction of any of the offenses charged in Counts 3 and 4 of this Indictment, the

4  defendant, ROBIN RAY THOMPSON, shall forfeit to the United States of America any

5  property, real or personal, involved in such offense, and any property traceable to such

6  property.

7

**Substitute Assets**

8    75.    If any of the above-described forfeitable property, as a result of any act or

9  omission of the defendant,

10    a.    cannot be located upon the exercise of due diligence;

11    b.    has been transferred or sold to, or deposited with, a third party;

12    c.    has been placed beyond the jurisdiction of the Court;

13    d.    has been substantially diminished in value; or

14    e.    has been commingled with other property which cannot be divided without

15          difficulty;

16  //

17

18  //

19

20  //

21

22  //

23

24  //

25

26  //

27

28  //

*United States v. Robin Ray Thompson*
Indictment - 26

1    it is the intent of the United States, pursuant to Title 21, United States Code, Section

2    853(p), to seek the forfeiture of any other property of the defendant, up to the value of the

3    above-described forfeitable property.

4

5

6                                            A TRUE BILL:

7
                                             DATED:    January 15, 2020
8

9                                            *(Signature of Foreperson*

10                                           *redacted pursuant to policy*

11                                           *of the Judicial Conference)*
                                             FOREPERSON
12

13

14    _____

15    BRIAN T. MORAN
      United States Attorney
16

17    _____

18    ANDREW FRIEDMAN
      Assistant United States Attorney
19

20    _____

21    FRANCIS FRANZE-NAKAMURA
      Assistant United States Attorney
22

23

24

25

26

27

28

*United States v. Robin Ray Thompson*
Indictment - 27